

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

| | | |
|---|---|---|
| *J. Brendan Day* | *402 East State Street* | *609-989-0569* |
| *Assistant United States Attorney* | *Trenton, New Jersey 08608* | |

October 27, 2017

<u>Filed on ECF</u>

The Honorable Tonianne J. Bongiovanni
United States Magistrate Judge
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re:   United States v. Scott Newsholme
>          Mag. No. 17-5015 (TJB)

Dear Judge Bongiovanni:

      Please accept this letter in support of the government's motion, made pursuant to 18 U.S.C. §§ 3142 and 3148, to detain defendant Scott Newsholme pending trial in this matter. As detailed below, and as alleged in the four-count amended criminal complaint unsealed today, the government has obtained substantial evidence demonstrating that Newsholme has continued his scheme to defraud even after his arrest on September 6, 2017. This newly discovered fraudulent conduct makes clear that (i) Newsholme has flagrantly violated the conditions of pre-trial release set forth in the Court's original bail order, and (ii) he presents a pressing and ongoing danger to the community. The evidence detailed below provides a sound basis for the Court to detain the defendant pending trial.[1]

---

[1]   The government further wishes to bring to the Court's attention its view that the allegations set forth in Count Four and paragraphs 70 through 83 of the amended complaint, and the evidence upon which this motion is based, create an actual, material, and ongoing conflict of interest for the defendant's counsel of record, who is identified in the amended complaint as "Attorney A." The government is providing a copy of the amended complaint, and this letter and its exhibits, to both counsel of record and to the Office of the Federal Public Defender in the hopes of resolving this issue by way of consent.

## I. The Initial Criminal Complaint

On September 6, 2017, the defendant was arrested and charged in a three-count criminal complaint with the following offenses: (i) mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; (ii) wire fraud, in violation of 18 U.S.C. §§ 1343 & 2; and (iii) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. (Dkt. 1.) The complaint outlines at length (but only in part) allegations of a fraudulent scheme that Newsholme perpetrated against a series of victims; the victims identified in the original complaint are referred to as Victims 1 through 6. In essence, Newsholme stands charged with misappropriating millions of dollars that his clients, including but not limited to Victims 1 through 6, provided to him with the expectation and belief that Newsholme, as their investment advisor, would invest the money on their behalf. Instead, the complaint alleges that Newsholme systematically took his clients' money and used it for his own personal use and to repay other investors.

## II. Initial Appearance and Pre-Trial Release

Newsholme made his initial appearance on the day of his arrest and, without objection from the government, the Court released him on a $250,000 unsecured bond with a number of standard and special conditions. The very first condition of Newsholme's release is that he "must not violate any federal, state[,] or local law while on release." (Dkt. 6, at 1.) At the government's request, the Court also imposed a special condition prohibiting Newsholme from "obtain[ing] any new loans or lines of credit, from any source, without the express approval from Pretrial Services[, which] shall be permitted to confer with the U.S. Attorney's Office for new loans or lines of credit." (*Id.* at 2.) The Court imposed this condition based on information that, before his arrest, Newsholme had been seeking a loan from a private party, purportedly to repay certain victims of his offense. Indeed, the government advised the Court that it was "highly concerned" that the prospective loan "could be a perpetuation of the alleged fraud." *See* Ex. A, at 5:14-22.

At the close of the initial appearance, the Court cautioned the defendant about the importance of complying with his bail conditions:

> [A] lot of what happens to you is within your control because these are standard conditions, and I think they're conditions that you should be able to understand and comply with. And if you don't, then you'll be back here in front of me. So as I said at the outset, just make sure you understand what you need to do. Stay out of trouble, and then you will just be able to proceed with this case without having to appear in front of me.

*See id.* at 9:6-17.

### III.   Developments Following Newsholme's Pre-Trial Release

Since the initial appearance on September 6, the government has learned that Newsholme has continued engaging in the same kind of criminal conduct for which he was charged in the original complaint, in violation of federal law and his original bail conditions.  Specifically, the government has learned that over a period of time—both before and after his arrest and release on bail—Newsholme misappropriated more than $60,000 in funds provided to him by one of his clients, who was a previously unidentified victim.  That client, referred to in the amended complaint and herein as "Victim 7," believed and intended that Newsholme would use the money she gave him to establish an escrow account for her so that she could make a down payment on a house.  Unbeknownst to Victim 7, Newsholme instead used the money for his own personal and business expenses, including thousands of dollars in cash withdrawals, mortgage payments, rent for his business, fees to his counsel of record in this matter, and for other things.  Moreover, after he was arrested, charged, and released on bail, to conceal his theft of her money, Newsholme provided Victim 7 forged and fabricated documents—purporting to be from his counsel of record in this matter—misrepresenting that Victim 7's money was, in fact, safe in an escrow account established by his criminal defense attorney.

The facts on which this motion is based are alleged in the amended complaint, and are amplified in detail below.[2]

*Pre-Arrest Conduct – Newhsolme's Misappropriation of At Least $39,000 Provided By Victim 7 For Escrow Account*

- On July 28, 2017, Newsholme deposited check #1016 in his personal account at Amboy Bank ending in 6617 (the "Amboy 6617 Account").  The check, made payable to Newsholme personally, was for $19,000 and was drawn on a Wells Fargo account held in the name of Victim 7's business.  Victim 7 signed the check, a redacted copy of which is submitted as Exhibit B.

- Shortly thereafter, on August 1, 2017, Newsholme transferred $18,500 from the Amboy 6617 Account to his business account at Amboy Bank ending in 5372 (the "Amboy 5372 Account").  *See* Ex. C.  The day before Newsholme made this transfer, the Amboy 5372 Account was overdrawn by $105.78.  After the transfer into the Amboy 5372 Account, Newsholme wrote a series of checks and made other withdrawals from that account to pay for personal and business expenses.  By way of example and not

---

[2]   The government did not learn of any of the facts set forth herein until after Newsholme had been arrested, charged, and released on bail.

limitation, a review of bank records for the Amboy 5372 Account revealed the following outgoing debits from the account after the $18,500 transfer on August 1, 2017[3]:

- Check #1705, dated August 1, 2017, for $3,500, made payable to Newsholme's wife.

- A debit on August 1, 2017 for $455, paid to Discover Bank.

- Two electronic payments on August 1, 2017 totaling $268, paid to Capital One Bank.

- Check #1704, dated August 1, 2017, for $2,000, made payable to "Cash." The back of the check is endorsed with Newhsolme's signature.

- Check #1703, dated August 2, 2017, for $275, made payable to two of Newsholme's tax clients. The memo notation on the check reads "Refund 2016 Tax," appearing to denote a refund of tax return preparation fees that previously had been paid to Newsholme.

- Check #1551, dated August 4, 2017, for $6,000, made payable to "Cash," with a memo notation that reads "College/Florida." The back of the check is endorsed with Newhsolme's signature.

- Debit on August 7, 2017 for $300 paid to "Tradewinds Island St Pete Beach FL."

- A debit on August 7, 2017 for $787.97, paid to Verizon.

- Check #1576, dated August 7, 2017, for $2,602.64, made payable to Wells Fargo Home Mortgage. A memo notation on the check reads, "Loan: Karwatt [account number]." Karwatt is the last name of Newsholme's parents-in-law.

- Check #1582, dated August 7, 2017, for $133.10, made payable to Humana, a health insurance provider. This check bounced.

---

[3]     The August and September 2017 bank statements for the Amboy 5372 Account, and accompanying copies of the checks drawn on that account, are submitted as Exhibit D to substantiate all of the transactional information discussed in this letter.

- o Check #1583, dated August 7, 2017, for $116.50, made payable to Lawrenceville Neurology, with a memo notation that identifies Newsholme's parents-in-law.  This check bounced.

- o Check #1584, dated August 7, 2017, for $105.69, made payable to the Gap.  This check bounced.

- o Check #1589, dated August 7, 2017, for $631.68, made payable to Key Bank, with a memo notation bearing what appears to be an account number.  This check bounced.

- o Check #1581, dated August 7, 2017, for $890.67, made payable to Carrier.  This check bounced.

- o Check #1586 and #1588, both dated August 7, 2017, for $101.57 and $174.77, respectively, both made payable to Verizon.  Both checks bounced.

- o Check #1600, dated August 17, 2017, for $5,500, made payable to Newsholme's wife.  This check bounced.

- On August 17, 2017, Newsholme deposited into the Amboy 6617 Account another check given to him by Victim 7.  This check, a redacted copy of which is submitted as Exhibit E, was a cashier's check made payable to Newsholme personally, it was for $20,000.00, and it bore the memo notation "For Escrow Account."

- On August 21, 2017, Newsholme transferred $20,000 from the Amboy 6617 Account to the Amboy 5372 Account.  *See* Ex. C.  Given the sizeable expenditures that Newsholme had made after the $18,500 transfer three weeks earlier, at the time of the $20,000 transfer, the Amboy 5372 Account was overdrawn by about $5,992.00.  After the transfer, Newsholme made the following payments and withdrawals from the Amboy 5372 Account:

  - o Check #1603, dated August 21, 2016—the same day the transfer cleared—for $3,000, made payable to Greg Tomczak.  Mr. Tomczak is the defendant's retained counsel of record in this criminal case.

  - o Check #1601, also dated August 21, 2017, for $9,430, made payable to the landlord of Newsholme's business.

        The memo notation—"MVP (April-May) ($4715–)"—makes clear that this check was used to make rent payments for Newsholme's business for April and May 2017.

- A branch withdrawal of $5,500 from the Amboy 5372 Account. The withdrawal slip bears Newsholme's signature.

- A debit on August 28, 2017 for $402.95 for "Cardtronics CCWF Belmar NJ."

- Check #1602, dated August 25, 2017, for $14,145, made payable to the landlord of Newsholme's business. The memo notation reads "MVP – (June July August) $4715," again making clear that the check covered the business's rent for June, July, and August 2017. This check bounced.

- Check #1604, dated August 29, 2017, for $1,274.39, made payable to Wells Fargo Home Mortgage. The memo notation on the check references the same account number as check #1576, referenced above. This check bounced.

    The foregoing activity is identical in nature to the fraudulent conduct for which Newsholme was charged originally in this case.[4] Victim 7 has advised law enforcement that she was in the market to purchase a house, and that she was preparing to obtain a mortgage loan to do so. She stated that Newsholme is her tax return preparer, and that he offered to help her improve her credit and obtain a mortgage loan so that she could purchase a house. According to Victim 7, Newsholme told her, in sum and substance, that the money she provided him would be held in escrow for the purpose of obtaining financing for, and purchasing, a new home. Based upon this misrepresentation, Victim 7 wrote the $19,000 and $20,000 checks described above, and also gave Newsholme an additional amount of cash for that purpose.[5]

---

[4] *See, e.g.*, Compl. (Dkt. 1) ¶¶ 11-13 (alleging fraudulent misappropriation of two checks provided to Newsholme for investment purposes by Victim 1); *id.* ¶¶ 24-33 (alleging fraudulent misappropriation of several checks provided to Newsholme for investment purposes by Victims 2 and 3); *id.* ¶¶ 39-44 (alleging fraudulent misappropriation of several checks provided to Newsholme for investment purposes by Victim 4); *id.* ¶¶ 45-55 (alleging fraudulent misappropriation of several checks provided to Newsholme for investment purposes by Victim 5); *id.* ¶¶ 56-67 (alleging fraudulent misappropriation of several checks provided to Newsholme for investment purposes by Victim 6).

[5] Notably, the defendant is neither an attorney nor in the real estate business. Unapparent is why Newsholme would ever—legitimately—need to receive two checks made

- 6 -

Instead of safekeeping Victim 7's money so that it could be used for its intended purpose, however, Newsholme misappropriated the money to pay his defense attorney, to pay overdue rent for his business, to pay routine personal expenses, to give money to his wife, and to make branch withdrawals from the bank.  Law enforcement's review of the defendant's bank records revealed nothing consistent with the establishment of an escrow account for Victim 7's benefit.

*Newsholme's Post-Arrest Theft of Additional Money and His Fraudulent Concealment*

This newly discovered fraud is troubling enough.  Worse still, the evidence reveals that Newsholme *continued* fraudulently obtaining checks from Victim 7 *after* he was arrested, charged, and released on bail—again, for the putative purpose of contributing to the escrow account for Victim 7.  Specifically, Victim 7 gave Newsholme at least two additional checks, like the checks already described, for the purpose of helping her secure financing for the purchase of a house.  These two post-arrest checks to Newsholme are described below, and a photograph of both checks (as provided by Victim 7) is submitted here as Exhibit F:

- A cashier's check from Wells Fargo, dated September 11, 2017—**five days after Newsholme's initial appearance**—made payable to Scott Newsholme for $4,000.00.  Victim 7 advised law enforcement that she purchased this check at Newhsolme's suggestion for the purported escrow account.  Victim 7 is identified on the check as its purchaser and remitter.  The memo notation on the check reads "Closing Cost Funds."

- Check #1040, drawn on the Wells Fargo account held by Victim 7's business, dated September 26, 2017—**approximately three weeks after Newsholme's initial appearance**—made payable to Scott Newsholme, for $3,700.00.  Victim 7 advised law enforcement that she wrote this check, too, at Newsholme's suggestion for the purported escrow account.  The memo notation on the check reads "For House Purchase Escrow Account."

Law enforcement received copies of these two checks very recently, on October 24, and so has not yet been able to identify where or how

---

payable to him personally, so that he could facilitate someone else's mortgage loan application or escrow account.

Newsholme negotiated these checks, or what he did with the additional $7,700 that Victim 7 gave him.  For the reasons discussed above and those set forth below, however, the government can say with confidence that the money *did not* go into an escrow account held on Victim 7's behalf.

All told, Victim 7 advised law enforcement that she gave Newsholme a total of approximately $62,000 in connection with the anticipated mortgage loan which, based on his misrepresentations to her, she believed would be placed in escrow for her benefit.

Newsholme's post-arrest fraudulent misrepresentations to Victim 7 did not stop there.  Victim 7 advised law enforcement that when she did not receive any documentation regarding the escrowed funds, she asked Newsholme for documentation.  In response, between on or about September 20, 2017 and on or about October 12, 2017—after his arrest and release on bail—Victim 7 received from the defendant a letter, which is submitted here as Exhibit G.  That letter purports to be from Mr. Tomczak, Newsholme's counsel of record in this case.  The document bears a letterhead with defense counsel's name and New Jersey address; it is purportedly addressed to a sales representative at a mortgage lender; and it contains a subject line identifying Victim 7.

The body of the letter falsely represents that Mr. Tomczak had "opened an escrow account as instructed [by the lender] and [that] it ha[d] been funded in the amount of $62,000 to be used for the purchase and closing costs for [Victim 7's] primary home purchase."  The letter further represents that "[t]his money is intended to be used for this reason only and if the closing does not happen for whatever reason, I will release the money back to [Victim 7] in accordance with NJ state law."  Finally, the letter bears the purported signature of "Gregory E. Tomczak, Esq."  Based on this documentation—which Newsholme provided directly to Victim 7 *after his arrest and release in this case*—Victim 7 believed that her money was held safely in an escrow account established by defense counsel.  Victim 7 had not, however, ever spoken to Mr. Tomczak, nor did she know who he was.

The evidence reveals that the letter Newsholme provided to Victim 7 is a forgery.  *First*, the government is in possession of multiple documents bearing Mr. Tomczak's true signature.  Those documents are attached as Exhibit H.[6]  The signature on the letter that Newsholme provided to Victim 7 looks nothing remotely like counsel's real signature.  *Second*, it appears impossible for counsel to have put Victim 7's $62,000 in an escrow account when, as the bank records discussed above show, Newsholme misappropriated at least $39,000 of that money for his own benefit.  *Third*, during an interview with the

---

[6]     Mr. Tomczak signed one of these documents on September 28, 2017, in the presence of two federal agents.  The other document, which is consistent with counsel's more recent signature, is over seven years old.

purported recipient of the letter—the sales representative at the mortgage lender—the representative advised law enforcement that he did not, to the best of his knowledge and recollection, ever receive such a letter. *Fourth*, the representative advised law enforcement that it would have been "peculiar" to receive such a letter, because the mere fact that money had been put in escrow would have had no real bearing on the loan approval process. *Finally*, in a telephone interview with law enforcement, Mr. Tomczak himself confirmed that (i) he did not write or sign the letter; (ii) he did not authorize that it be written or signed on his behalf; and (iii) he did not establish an escrow account for Victim 7.

That is not all. More recently, the defendant provided Victim 7 still more fraudulent documentation in connection with the purported escrow account. After speaking to law enforcement, Victim 7 requested that Newsholme return her "escrow" money. In response, Newsholme advised her that he would do so, but that it would take three to five business days. In October 2017—again, after the initial appearance—Newsholme provided Victim 7 a form, entitled "Release of Funds Held in Escrow." It bears a date of October 12, 2017, purports to be addressed to Mr. Tomczak at his business address, and has a subject line that reads "Release of Funds in Escrow." The document directs Mr. Tomczak "to release the balance of the purchase price down payment of $62,000 to [Victim 7]," and requests that the money be wired to her as soon as possible. Upon receiving this document from Newsholme, Victim 7 signed it and returned it to Newsholme, with the understanding that Newsholme would provide it to Mr. Tomczak for execution. The blank and signed versions of this form are submitted as Exhibit I.

Once again, the evidence reveals that the "Release of Funds Held in Escrow" document that the defendant provided to Victim 7 contains fraudulent misrepresentations that were designed to confirm the existence of the escrow account and the safety of Victim 7's money. In fact, however, as discussed above, Newsholme misappropriated Victim 7's money and put it to his personal use. At approximately 2:53 p.m. yesterday (October 26), Victim 7 advised law enforcement that her money still had not been returned to her.

In sum, the evidence shows that the defendant stole approximately $62,000 from Victim 7, which she provided to him under the false pretense that he would facilitate the money being put into escrow on her behalf so that she could obtain financing for, and purchase, a house. Newsholme instead misappropriated that money for his own personal use. Indeed, his theft of Victim 7's money continued even *after* he was arrested, charged, and released on bail; even *after* the government expressed concern that Newsholme would continue his fraudulent conduct upon release; and even *after* this Court admonished the defendant about the importance of complying with the imposed bail conditions. Also after his initial appearance, the defendant made

blatant material misrepresentations to Victim 7 about the true status of those funds: He provided Victim 7 a fabricated letter bearing the forged signature of his own criminal defense attorney, and a fraudulent document purporting to be a formal request to counsel for the return of that money. These misrepresentations had the purpose and effect of concealing Newsholme's fraudulent misappropriation of Victim 7's money.

## IV.  Legal Standards

"Upon the appearance before a judicial officer of a person charged with an offense," the Court must determine whether to order the defendant released or detained pending trial. 18 U.S.C. § 3142(a). If, after a hearing, the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," it must order the defendant detained pending trial. *Id.* § 3142(e). In making that determination, the Court must consider information such as the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the history and characteristics of the defendant, including, among other things, the defendant's character, employment, financial resources, and past conduct; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id.* § 3142(g).

Additionally, "[a] person who has been released under [18 U.S.C.] section 3142 . . . , and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). Under § 3148(a), bail shall be revoked if the Court "(1) finds that there is . . . probable cause to believe that the person has committed a Federal, State, or local crime while on release . . . and (2) finds that . . . (A) based on the factors set forth in [18 U.S.C.] section 3142(g) . . . , there is no condition or combination of conditions of release that will assure that the person will not . . . pose a danger to the safety of any other person or the community; or (B) the person is unlikely to abide by any condition or combination of conditions or  release." *Id.* § 3142(e). If there is probable cause to believe that the defendant has committed a crime while on pre-trial release, there is a rebuttable presumption that no condition or combination of conditions will assure the safety of the community. *Id.*

Whether analyzed as part of a new bail hearing under § 3142 in connection with the amended complaint, or under § 3148's bail revocation standard, the United States respectfully submits that detention is warranted here.

## V. Argument

The United States does not make this motion lightly. Unfortunately, however, the concern that the government expressed at the defendant's initial appearance has come to pass. It is now apparent that the defendant poses a serious and pressing danger to the community that cannot be addressed by any additional conditions or combination of conditions. The Court should order Newsholme detained pending trial.

It is well established that the question whether the defendant poses a risk to the safety of the community is not limited to the risk of physical harm or violence. *See, e.g., United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979) (explaining that "[a] defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute sufficient risk of danger to come within contemplation of [the predecessor to the Bail Reform Act]"); *United States v. Madoff*, 316 F. App'x 58, 59-60 (2d Cir. 2009) (not precedential) (noting sufficient record evidence to support detention pending trial based on the defendant's "danger to the [pecuniary] safety of any other person or the community if released"); *United States v. Reynolds,* 956 F.2d 192, 192-93 (9th Cir. 1992) (summary order) ( "[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Schenberger*, 498 F. Supp. 2d 738, (D.N.J. 2007) ("A danger to the community does not only include physical harm or violent behavior. The concept of 'safety' may include non-physical harm."); *United States v. Conover,* Mag. No. 12-2080 (JS), 2012 WL 4846132, at *4 (D.N.J. Oct. 10, 2012) ("A danger to the community does not only include physical harm or violent behavior."); *United States v. Giampa*, 904 F. Supp. 235, 358 (D.N.J. 1995) (noting, in the context of post-conviction release, that "danger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Leonetti*, Crim. No. 88–003, 1988 WL 61738, at *2 (E.D. Pa. June 9, 1988) (*Provenzano* "instructed that community danger not only meant a crime of physical violence, but also included the commission of future economic crimes as well.").

The defendant's post-arrest conduct described above is fraudulent, criminal, and a blatant violation of the very first condition of his pre-trial release. Indeed, Newsholme's post-arrest conduct is a brazen extension of the very same criminal conduct that brought him before the Court in the first place. Newsholme's willingness not only to flout the original conditions of his pre-trial release, but to engage in new criminal behavior, underscores his immediate and ongoing risk to the community. The evidence also reveals that Newsholme has neither the intent nor ability to abide by any conditions of release the Court may set.

Significantly, as noted, Victim 7 recently requested Newsholme to return her "escrow" money, and Newsholme responded that he would do so, but that it

would take three to five days.  As demonstrated above, however, within days of depositing the $19,000 and $20,000 checks from Victim 7, Newsholme promptly spent it on other things.  And there is strong reason to believe that the rest of the money went elsewhere, too.  Even still, Newsholme provided multiple fabricated documents to Victim 7 representing to her that the funds could and would be returned upon request.  *See* Exs. G, I.  On that score, submitted as Exhibit J is a series of recent text messages between Newsholme and Victim 7 that reveals what the defendant presently is up to.[7]  There is an exceedingly high risk that Newsholme will obtain through fraud the funds needed to repay Victim 7.  Newsholme then will need to obtain through fraud the funds needed to repay the next victim.  And so on.  Accordingly, Newsholme poses an immediate danger to the community that only detention can address.

      No matter the conditions of release that the Court might impose, no matter the warnings the Court may give, there now can be no doubt that short of bail revocation and detention, Newsholme will continue to victimize other people.  Newsholme has no consistent or reliable source of legitimate income or other existing monetary resources.  There are no apparent means by which he can continue to pay his living expenses legitimately.  Indeed, merely paying routine bills over the last couple of months appears to have required him to steal significant sums from Victim 7.  Given the defendant's consistent pattern of fraudulent conduct—even after his arrest and notwithstanding the conditions imposed upon him—the evidence demonstrates that he will continue to defraud more and more victims.  The evidence further demonstrates that the danger of Newsholme victimizing more and more people while this case is pending cannot be abated by any set of conditions that the Court could add to the original pre-trial release order.

      Respectfully, this cycle of fraud must stop.

---

[7] The text messages in Exhibit J span from Friday, October 13, to this past Tuesday, October 24.

\* \* \*

The government requests that the Court enter an order detaining the defendant pending trial in this matter.

                              Respectfully submitted,

                              WILLIAM E. FITZPATRICK
                              Acting United States Attorney

                  By:    *s/ J. Brendan Day*

                              J. Brendan Day
                              Assistant United States Attorney

cc:    Gregory E. Tomczak, Esq. (via ECF)
       Wendy Lonsdorf, U.S. Pretrial Services (via ECF)
       Office of the Federal Public Defender (via e-mail)